**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| AUDIOEYE, INC., <br><br>         Plaintiff, <br><br>     v. <br><br> ACCESSIBE LTD., <br><br>         Defendant. | Case No. 6:20-cv-997 |

**COMPLAINT**

Plaintiff AudioEye, Inc. ("AudioEye") hereby complains of Defendant accessiBe Ltd. ("accessiBe"), and alleges as follows:

**I.  INTRODUCTION**

1.      AudioEye provides software tools and services to make the internet more accessible to individuals with disabilities.  This includes tools to render website content accessible to those who rely on assistive technologies, such as screen readers.  AudioEye's innovative technology, developed over the course of a decade, has improved tens of thousands of websites.  Millions of individuals with disabilities in the United States and throughout the world benefit from AudioEye's removal of digital barriers that otherwise limit their access to web content.

2.      The United States Patent and Trademark Office has awarded AudioEye several patents on its proprietary technology.

3.      In 2018, accessiBe began marketing and selling a software product here in the United States that infringes AudioEye's patents.  This action seeks relief for the willful

-1-

infringement of AudioEye's patents by accessiBe, including in connection with several customers or resellers in this Judicial District.

4.     In addition to its acts of willful patent infringement, accessiBe has targeted AudioEye's customers here in the United States through a pattern of improper business practices, as set forth in more detail below.  This includes misrepresenting the effectiveness of its product by spoofing an industry-standard tool, developed by a neutral third-party accessibility testing company, used to verify whether websites are accessible to individuals with disabilities.  The prominent third-party tool, called "WAVE," specifically warns users that accessiBe's product may "temporarily modify content" to cause "interference" with the "detection of and accuracy [of] identifying accessibility and compliance issues."  WebAIM, a non-profit organization based at the Center for Persons with Disabilities at Utah State University, developed the WAVE tool, which has now been programmed to issue the following red box warning each time the tool detects that accessiBe has been used on a website:

> The 3rd party accessiBe integration on this page may temporarily modify content when WAVE is activated resulting in interference with WAVE's detection of and accuracy identifying accessibility and compliance issues.

5.     That accessiBe added code to its product to attempt to spoof one specific industry-standard checker tool suggests accessiBe added code to spoof other checker tools. Moreover, that accessiBe is attempting to spoof checker tools raises serious questions whether accessiBe's product provides the accessibility modifications or benefits accessiBe claims it provides.  In fact, upon information and belief, accessiBe's product, in an attempt to save costs and contrary to industry best practices, often adds barriers to accessibility.  And rather than

improving a website, its product often resorts instead to creating a separate—and unequal—web space for individuals with disabilities.

6.   In addition to spoofing the WAVE tool, accessiBe, upon information and belief, also manipulates the results of checks performed on AudioEye's customers' websites by impermissibly preventing AudioEye's technology from properly loading or operating. AccessiBe then uses the manipulated results to falsely claim that AudioEye's technology does not work.  AccessiBe has presented such false claims to at least one AudioEye customer to wrongly interfere with AudioEye's business relationship with that customer.

7.   AccessiBe has also made several other false, misleading, and disparaging statements about AudioEye's products and business, including that AudioEye relies exclusively on manual remediation rather than automated remediation to improve the accessibility of its customers' websites.  The truth is that AudioEye and its products offer more auto-remediation than accessiBe and its product.

8.   AccessiBe has also anonymously and deceptively published a website at www.topwebaccessibility.com purporting to present an "unbiased review" of internet accessibility solution providers.  AccessiBe is using the anonymous website to deceptively present false, misleading, and disparaging statements about AudioEye and AudioEye's product. A screenshot of this website is below.



9. AccessiBe's false, misleading, and disparaging statements are set forth in more detail below.

10. This action seeks relief for the damage AudioEye has suffered as a result of accessiBe's improper business practices, as well as injunctive relief to stop accessiBe from continuing such practices.

## II. THE PARTIES

11. Plaintiff AudioEye is a Delaware corporation having its principal place of business at 5210 E. Williams Circle, Suite 750, Tucson, AZ 85711. AudioEye is a publicly traded company and its common stock trades on the NASDAQ stock exchange.

12.     Upon information and belief, Defendant accessiBe is a company registered in Israel under Registration No. 51-585530-2, having a place of business at Ha-Khilazon St 6, Bnei Brak, Israel.  Upon information and belief, accessiBe has no offices in the United States.

### III.  JURISDICTION AND VENUE

13.     This civil action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, more particularly, 35 U.S.C. §§ 271 and 281.  This complaint also includes claims for False Advertising and Product Disparagement under Section 43(a) of the Lanham Act; and Product Disparagement, Slander/Defamation, Tortious Interference with Prospective Economic Advantage, Deceptive Business Practices, and Unjust Enrichment under New York law.

14.     This Court has subject matter jurisdiction over the claims for patent infringement pursuant to at least 28 U.S.C. §§ 1331 and 1338(a).  This Court has subject matter jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(b).  This Court has at least supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims because, as set forth in more detail below, they are sufficiently related to the patent infringement claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This Court also has subject matter jurisdiction over all claims in this action pursuant to 28 U.S.C. 1332(a)(2) because AudioEye is a U.S. corporation and accessiBe is a company registered in Israel and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over accessiBe because accessiBe has committed some of the acts of patent infringement complained of herein in this Judicial District.

This includes the acts of patent infringement committed in connection with several customers or resellers with primary offices located in this Judicial District.

16.     Venue is proper in this Judicial District pursuant to at least 28 U.S.C. § 1391(c)(3) because accessiBe is a foreign corporation and subject to suit in any Judicial District.  *See also Brunette Machine Works, Ltd. v. Kockum Industries, Inc*., 406 U.S. 706, 709-710 (1972).

## IV.   STATEMENT OF FACTS

### A.     Background on Web Accessibility for Individuals with Disabilities

17.     Millions of Americans have disabilities, such as vision, motor, cognitive, or hearing impairments, that affect their ability to access information and content through the internet.  Most websites, including critical destinations such as workplace applications, online commerce, and information resources, are not fully accessible to individuals with disabilities.

18.     For example, many individuals with sight impairments are not able to view the text and images on a webpage.  Instead, these individuals rely on a screen reader, which presents an audible description of the text and images.  This helps the user understand the content of the webpage and also enables the user to navigate through the site.

19.     Screen readers function by examining the code the computer browser uses to render text and images on a webpage. This code is often in the form of hypertext markup language (HTML) document object model (DOM), or simply, "DOM."  The screen reader reads the code and interprets it. This includes reading and announcing a description of the images that appear on a webpage.

20.     Sometimes, however, website designers neglect to include an image description that a screen reader can read and announce to a user with sight impairments.  This can be

particularly common in online commerce websites that undergo frequent updates under time constraints.

21.      Other website shortcomings and issues render a webpage less accessible to individuals with disabilities.  In an effort to address these varied issues, domestic and international organizations have developed and promulgated rules and guidelines for website designers to implement to improve accessibility.  These standards include the Web Content Accessibility Guidelines (or "WCAG") published by an international internet standards organization.  The current version of the WCAG standards is WCAG 2.1.

22.      There are also several standards promulgated by groups and agencies in the United States.  For example, Section 508 of the Rehabilitation Act of 1973 has been amended to require Federal agencies to make electronic information technology accessible to individuals with disabilities, and government agencies have established standards to comply with these laws.  Also, the U.S. Justice Department has previously indicated that the Americans with Disabilities Act, or "ADA," applies to internet spaces.

23.      Industry best practices are to comply with current WCAG standards to provide equivalent access for all users and, as necessary, to ensure compliance with Section 508 and the ADA.

**B.      AudioEye's Novel and Patented Web Accessibility Technology**

24.      Over the course of many years, AudioEye developed software tools and processes that help website owners modify and improve their sites to render them more accessible to individuals with disabilities.  AudioEye's technology has rendered tens of thousands of websites more accessible to internet users all over the world.

25.     One of the enhancements provided by AudioEye's technology involves automatically supplementing a webpage DOM to include missing image descriptions. AudioEye's automated corrections are used by a screen reader to read and announce the otherwise missing image descriptions to users relying on screen readers for audible output.

26.     AudioEye's technology includes many other automated processes for modifying a website to render it more accessible to individuals with disabilities.  Many of these modifications are based on the WCAG standards and materially improve accessibility for all users.

27.     Beginning in 2016, AudioEye filed applications with the United States Patent & Trademark Office to protect its web accessibility technology.  AudioEye has been awarded several patents on its novel technology.

28.     AudioEye is the owner by assignment of all right, title, and interest in and to U.S. Patent No. 10,423,709, entitled "Systems, Devices, and Methods for Automated and Programmatic Creation and Deployment of Remediations to Non-Compliant Web Pages or User Interfaces" ("the '709 patent"), which the United States Patent and Trademark Office lawfully and duly issued on September 24, 2019.  A true and correct copy of the '709 patent is included as Exhibit 1.

29.     AudioEye is the owner by assignment of all right, title, and interest in and to U.S. Patent No. 10,444,934, entitled "Modular Systems and Methods for Selectively Enabling Cloud-Based Assistive Technologies" ("the '934 patent"), which the United States Patent and Trademark Office lawfully and duly issued on October 15, 2019.  A true and correct copy of the '934 patent is included as Exhibit 2.

30.     AudioEye is the owner by assignment of all right, title, and interest in and to U.S. Patent No. 10,762,280 entitled "Systems, Devices, and Methods for Facilitating Website

Remediation and Promoting Assistive Technologies" ("the '280 patent"), which the United States Patent and Trademark Office lawfully and duly issued on September 1, 2020.  A true and correct copy of the '280 patent is included as Exhibit 3.

31.     AudioEye is the owner by assignment of all right, title, and interest in and to U.S. Patent No. 10,809,877 entitled "Modular Systems and Methods for Selectively Enabling Cloud-Assistive Technologies" ("the '877 patent"), which the United States Patent and Trademark Office lawfully and duly issued on October 20, 2020.  A true and correct copy of the '877 patent is included as Exhibit 4.

**C.     AccessiBe's Infringement of AudioEye's Patents**

32.     Upon information and belief, last year, in 2018, accessiBe began offering and selling a software product here in the United States.  AccessiBe claims its product can be used to makes websites more accessible to individuals with disabilities (the "infringing web accessibility tool").  Upon information and belief, accessiBe's claims include the assertion that, like AudioEye's patented technology, its product can be used to automatically add missing image descriptions to a website's DOM.  And these descriptions, upon information and belief and according to accessiBe, can be used by screen readers to read and announce otherwise missing descriptions to users with sight impairments.

33.     Upon information and belief, and as set forth in more detail below, accessiBe's product takes advantage of AudioEye's novel web accessibility technology and infringes AudioEye's patents.

**D.     AccessiBe's Pattern of Improper Business Practices to Target and Interfere with AudioEye's Customer Relationships**

34.     Since the launch of its infringing web accessibility tool, accessiBe not only has been infringing AudioEye's patents, but it has also been targeting AudioEye's customer relationships through improper business practices.

### 1.     To Generate False Accessibility Reports, AccessiBe Prevents AudioEye's Software Code from Properly Loading or Operating

35.     Upon information and belief, part of accessiBe's improper business practices includes improperly interfering with AudioEye's proprietary software code that is used by AudioEye's customers.  Upon information and belief, accessiBe does this to generate false reports that misrepresent the effectiveness of AudioEye's accessibility technology.  Upon information and belief, this, in turn, is done to encourage AudioEye's customers to terminate their relationship with AudioEye and to form a relationship with accessiBe.

36.     For example, upon information and belief, in June 2020, accessiBe purported to run a test on the website code of the following AudioEye customer: the Marketing Association for the Fingerlakes Wine Country of New York ("Fingerlakes"), located in New York.  The test was purportedly conducted to determine the website's compliance with WCAG and other standards.  However, upon information and belief, before it ran the "test," accessiBe, without authorization, prevented AudioEye's web accessibility technology from properly loading or operating.  Upon information and belief, after preventing the technology from properly loading or operating, accessiBe ran the "test," and compared Fingerlakes's site to several standards outlined in the WCAG.  AccessiBe referenced this "test" in asserting to Fingerlakes that its website was not compliant in certain ways.

37.     Upon information and belief, accessiBe documented its misrepresentations and sent them to Fingerlakes.  The document was entitled "Compliance Audit."  AccessiBe's document described how accessiBe purported to analyze Fingerlakes's website for compliance

with the requirements of the latest WCAG standards.  In the document, accessiBe asserted that

Fingerlakes's site was "non-compliant."  The following is an image showing the cover of

accessiBe's document:



38.     Upon information and belief, in its document, accessiBe purported to report the

software code that supported its asserted conclusion of non-compliance.  A review of that code

indicates that accessiBe interfered with AudioEye's proprietary code to prevent AudioEye's web

accessibility technology from properly loading or operating before it conducted its "test."  This

resulted in falsely claiming to AudioEye's customer Fingerlakes that AudioEye's technology

failed to provide the accessibility that it does in fact provide.

39.     Fingerlakes notified AudioEye about accessiBe's false "report." This forced

several AudioEye employees to expend resources running extensive testing on Fingerlakes's site

and preparing a report to explain to Fingerlakes how accessiBe's "test" was false. After

spending many hours addressing these issues, Fingerlakes agreed to remain an AudioEye

customer.

40.     While accessiBe was not successful at convincing Fingerlakes to terminate its

relationship with AudioEye, it was successful at convincing other customers to do so. This

includes Hoselton Auto Mall ("Hoselton"), also of New York. Upon information and belief,

these customers, including Hoselton, terminated their partner contracts with AudioEye based on,

at least in part, accessiBe's false reports of AudioEye's effectiveness, similar to accessiBe's

actions with Fingerlakes.

## 2.     AccessiBe Made a False, Misleading, and Disparaging Public Statement that AudioEye Relies Exclusively on Manual Website Remediation Rather than Leveraging Automated Remediation

41.     Upon information and belief, accessiBe has made at least one false, misleading,

and disparaging public statement about AudioEye and AudioEye's products. For example, upon

information and belief, at least one accessiBe representative has stated to a consumer in New

York during a sales call that AudioEye relies exclusively on manual website remediation rather

than leveraging automated remediation to efficiently improve the accessibility of customers'

websites. Upon information and belief, the accessiBe representative stated that AudioEye claims

manual remediation is required so that AudioEye can extract higher prices from its customers.

42.     These statements are false. As reflected in its issued patents, statements on its

website, and elsewhere, AudioEye has developed many automated remediations to efficiently

improve its customers' websites.  Upon information and belief, at least because accessiBe is

aware of AudioEye's patents and website, accessiBe knows that its statement that AudioEye

relies exclusively on manual remediation is false.  AccessiBe made these statements to damage

AudioEye, improperly take AudioEye's customers, and damage AudioEye's reputation.

> **3.      AccessiBe Makes Other False and Disparaging Comments about AudioEye's Pricing and Performance**

43.     Upon information and belief, accessiBe's pattern of using improper business

practices to target AudioEye's customers includes false and disparaging statements about

AudioEye's business, including false and disparaging statements about AudioEye's prices and

performance.  Upon information and belief, on its website, for example, accessiBe purports to

compare its product offerings to AudioEye's business, including AudioEye's pricing and the

time required for AudioEye to deploy its web accessibility technology.  For example, accessiBe

purports that AudioEye's tools and services cost its customers $5,000-$50,000 per year.  The

following is a screenshot showing this assertion on accessiBe's website.



44.     AudioEye's tool and services, however, are, for many customers, free.  This can be seen from a simple review of AudioEye's website.  The following is a screenshot from AudioEye's website showing its free offerings:



45.     And for a majority of customers, AudioEye's web accessibility technology costs less than $1,000 per year.  The following is a screenshot showing other common pricing options for AudioEye's technology:



46.     Upon information and beliefs, these false statements about AudioEye's business are part of accessiBe's pattern of improper business practices used to target and interfere with the relationships between AudioEye and its customers, including AudioEye's relationships with Fingerlakes and Hoselton, as well as customers and potential customers in Texas.

**4.     AccessiBe Publishes an Anonymous and Deceptive Website to Disparage AudioEye and Mislead the Public regarding AudioEye and AudioEye's Product**

47.     Upon information and belief, accessiBe anonymously published a false, misleading, and deceptive website to disparage AudioEye and mislead the public, including members of the public in Texas, regarding AudioEye and AudioEye's Product.  The website www.topwebaccessibility.com purports to present an "unbiased review" of internet accessibility solution providers, including accessiBe and AudioEye.  However, upon information and belief,

the website and its content were created and published by accessiBe employees, including

accessiBe's Director of Engineering.  A screenshot of the website is below.



48.     The "unbiased review" ranks accessiBe number one and states that accessiBe's

product provides, among other features, "continuous compliance every 24 hours," "simple

installation and enough guides for support," "AI accessibility solution to ADA, Section 508,

WCAG 2.1 AA or EN 301549 compliance," and "customizable interface according to user's

preference."  Meanwhile, the "unbiased review" ranks AudioEye and its product number four

and, unlike the description of accessiBe's product, the website fails to state that AudioEye

provides continuous compliance every 24 hours, fails to state that AudioEye provides simple

installation and adequate support, fails to states that AudioEye provides AI accessibility

solutions according to requirements of the ADA, Section 508, and WCAG 2.1, and fails to state that AudioEye provides a customizable interface.

49.     Because the website is structured as an "unbiased review," and because the website recites certain features for accessiBe's product while it fails to do so for AudioEye's product, the website falsely and misleadingly communicates to the public that AudioEye's product lacks those features.  AccessiBe's statements on the website are false.  As reflected in statements on its own website and elsewhere, AudioEye provides continuous compliance; simple installation and excellent support; AI accessibility solutions according to requirements of the ADA, Section 508, and WCAG 2; and a customizable interface.  Upon information and belief, at least because accessiBe is aware of AudioEye's website, accessiBe knows that its statements through the website are false.  AccessiBe made those statements to damage AudioEye, improperly take AudioEye's customers, and damage AudioEye's reputation.

> **5.     AccessiBe Spoofs a Third-Party Accessibility Checker Tool to Misrepresent the Effectiveness of its Product**

50.     Upon information and belief, accessiBe's pattern of improper business practices includes spoofing a neutral, third-party checker tool to misrepresent the effectiveness of its product.

51.     By way of background, to help improve web accessibility, neutral, third-party accessibility testing companies have developed industry-standard tools to check websites for proper accessibility and compliance with WCAG standards.  One prominent third-party checker is the Web Accessibility Evaluation Tool, or "WAVE," developed by the Web Accessibility in Mind ("WebAIM") organization at Utah State University.

52.     Upon information and belief, accessiBe spoofs, for example, the WAVE checker to misrepresent the effectiveness of its product.  Upon information and belief, accessiBe's

product includes software code that detects when the WAVE checker is being used to examine one of its sites.  Upon information and belief, accessiBe's product then automatically modifies the site to make it appear more accessible than the site does under normal operating conditions.

53.     Upon information and belief, WebAIM has discovered and publicized accessiBe's spoofing.  When the WAVE checker is applied to accessiBe's websites, it posts a warning that says "The 3rd party accessiBe integration on this page may temporarily modify content when WAVE is activated resulting in interference with WAVE's detection of and accuracy identifying accessibility and compliance issues."  An example showing this warning on a webpage is below.



54.     Upon information and belief, accessiBe relies on this spoofing to falsely claim that its product makes its websites WCAG, ADA, and Section 508 compliant, when it does not.  Upon information and belief, this spoofing and these misrepresentations are part of accessiBe's pattern of improper business practices used to target and interfere with the relationships between AudioEye and its customers, including AudioEye's relationships with Fingerlakes and Hoselton.

6. **AccessiBe's Additional Misrepresentations on its Website and in the Media about the Effectiveness of its Product**

55.     Upon information and belief, additional examples of accessiBe's practice of misrepresenting the effectiveness of its product are legion.  Upon information and belief, accessiBe repeatedly asserts that its product automatically renders a website WCAG compliant, when it does not.  Upon information and belief, on its website, for example, accessiBe states that "the process of becoming compliant using our solution is very simple . . . In 48 hours, our AI is finished, and your website is compliant."  In other marketing materials, accessiBe claims that its product "applies all the required adjustments to become ADA and WCAG 2.1 compliant."   In a facebook ad, accessiBe claims that its product can "make your website ADA & WCAG compliant in one click."  Also, in an article published on Entrepreneur.com, Shir Ekerling, accessiBe's CEO, is quoted as claiming that, "accessiBe will use the WCAG, a 1000-page huge guidebook that explains what accessible websites look and operate like, and how to make inaccessible websites accessible.  AccessiBe uses techniques from the WCAG to remediate a website into compliance."  *See* Entrepreneur.com, *How One Company is Working to Solve Web Inaccessibility,* https://www.entrepreneur.com/video/355687?utm_source=HearstNewspapers& utm_medium=related&utm_campaign=syndication.

56.     Upon information and belief, these assertions are known by accessiBe to be false. In a video entitled "accessiBe Response Video & Demonstration," for example, Ekerling responds to accusations that, as revealed by third-party checkers, accessiBe's product does not address all WCAG standards, does not make websites WCAG complaint, and actually renders some sites less accessible.  In the video, Ekerling admits knowledge of the issue, stating "he basically claims that with these testing tools, the number of accessibility errors jump rather than reduce when using accessiBe. . . . we are very much aware of that, and by the way, that is true,

we are very much aware of that." *See* YouTube.com, *accessiBe Response Video &*

*Demonstration*, https://youtu.be/7cdce-UrPfI.

57.    In fact, upon information and belief, under normal use, accessiBe's product does

not provide any accessibility remediations.  Upon information and belief, with accessiBe's

product, in order to render any attempted remediations, the user must first take a series of

actions, such as by opening a toolbar, enabling a certain mode, or following certain prompts.

Upon information and belief, these extra steps *add* barriers to access for individuals with

disabilities, and are done to save costs.

58.    Upon information and belief, these misrepresentations were used as part of

accessiBe's pattern of improper business practices to target and interfere with the relationships

between AudioEye and its customers, including AudioEye's relationships with Fingerlakes and

Hoselton.

## V.  <u>FIRST CAUSE OF ACTION</u>

### (INFRINGEMENT OF U.S. PATENT NO. 10,423,709)

59.     AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

60.     Upon information and belief, accessiBe has infringed at least Claim 19 of the '709 patent under at least 35 U.S.C. § 271(a), (b), (c), and (g).

61.     For example, upon information and belief, accessiBe has performed each of the limitations of Claim 19 of the '709 patent using a computer system in the United States.  Using its infringing web accessibility tool, accessiBe performs in the United States the recited steps of a computer implemented method for identifying structural patterns across a plurality of web pages and determining a set of remediations that can be applied collectively to the plurality of web pages, as set forth in more detail in Exhibit 5.

62.     Upon information and belief, accessiBe has knowledge of the '709 patent.  On September 4, 2020, before the complaint was filed, AudioEye sent a letter to accessiBe, identifying the '709 patent and explaining how accessiBe was infringing the patent.  AccessiBe also has knowledge of the '709 patent based on the filing of the complaint.

63.     Further, to the extent that AudioEye asserts only method claims of the '709 Patent, like Claim 19 in Exhibit 5, AudioEye is entitled to recover past damages and has complied with 35 U.S.C. § 287.

64.     Upon information and belief, accessiBe has actively induced others to infringe at least Claim 19 of the '709 patent by marketing and selling to its customers, including customers in this Judicial District, its infringing web accessibility tool, knowing and intending that its customers use it in a manner that infringes at least Claim 19 of the '709 patent.  For example,

using the demonstration videos mentioned in Exhibit 5, as well as other training materials, accessiBe instructs and teaches its customers how to use its tool to infringe the '709 patent. AccessiBe's acts constitute infringement of the '709 patent in violation of 35 U.S.C. § 271(b).

65.   Upon information and belief, accessiBe's acts constitute contributory infringement of the '709 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, accessiBe contributorily infringes because, for example, accessiBe offers to sell, sells, and/or imports into the United States its infringing web accessibility tool, which is not a staple article or commodity of commerce suitable for non-infringing use and which is used in performing the processes covered by at least Claim 19 of the '709 patent, and accessiBe knows its tool is especially made or adapted for use in an infringement of the '709 patent.

66.   Upon information and belief, accessiBe's acts constitute infringement of the '709 patent in violation of 35 U.S.C. § 271(g).  Upon information and belief, accessiBe imports into the United States or offers to sell to potential customers, sells to customers, and/or uses in the United States a product, such as a modified website, webpage, or HTML or DOM code for a website, that was made using its infringing web accessibility tool outside the United States (in, for example, Israel) by the processes covered by at least Claim 19 of the '709 patent.  AccessiBe states on its website, for example, that it has servers in the United States and Europe.

67.   AccessiBe's infringement of the '709 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '709 patent and its infringement thereof, thus acting in reckless disregard of AudioEye's patent rights.

68.   Because of accessiBe's infringement of the '709 patent, AudioEye has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

69.     Upon information and belief, unless enjoined, accessiBe, and/or others acting on behalf of accessiBe, will continue their infringing acts, thereby causing additional irreparable injury to AudioEye for which there is no adequate remedy at law.

## VI.  SECOND CAUSE OF ACTION

### (INFRINGEMENT OF U.S. PATENT NO. 10,444,934)

70.     AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

71.     Upon information and belief, accessiBe has infringed at least Claims 1 and 11 of the '934 patent under at least 35 U.S.C. § 271(a), (b), (c), and (g).

72.     For example, upon information and belief, accessiBe has performed each of the limitations of Claim 1 of the '934 patent using a computer system in the United States.  Using its infringing web accessibility tool, accessiBe performs in the United States the recited steps of a computer implemented method of programmatically assigning descriptive alt text to an element on a web page to enable an audible description of the element, the web page having an associated DOM code, as set forth in more detail in Exhibit 6.

73.     Upon information and belief, accessiBe has knowledge of the '934 patent.  On September 4, 2020, before the complaint was filed, AudioEye sent a letter to accessiBe, identifying the '934 patent and explaining how accessiBe was infringing the patent.  AccessiBe also has knowledge of the '934 patent based on the filing of the complaint.

74.     Further, because the '934 patent's claims are all method claims, AudioEye is entitled to recover past damages and has complied with 35 U.S.C. § 287.

75.     Upon information and belief, accessiBe has actively induced others to infringe at least Claims 1 and 11 of the '934 patent by marketing and selling to its customers, including

customers in this Judicial District, its infringing web accessibility tool, knowing and intending

that its customers use it in a manner that infringes at least Claims 1 and 11 of the '934 patent.

For example, using the demonstration videos mentioned in Exhibit 6, as well as other training

materials, accessiBe instructs and teaches its customers how to use its tool to infringe the '934

patent.  AccessiBe's acts constitute infringement of the '934 patent in violation of 35 U.S.C.

§ 271(b).

76.     Upon information and belief, accessiBe's acts constitute contributory

infringement of the '934 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief,

accessiBe contributorily infringes because, for example, accessiBe offers to sell, sells, and/or

imports into the United States its infringing web accessibility tool, which is not a staple article or

commodity of commerce suitable for non-infringing use and which is used in performing the

processes covered by at least Claims 1 and 11 of the '934 patent, and accessiBe knows its tool is

especially made or adapted for use in an infringement of the '934 patent.

77.     Upon information and belief, accessiBe's acts constitute infringement of the '934

patent in violation of 35 U.S.C. § 271(g).  Upon information and belief, accessiBe imports into

the United States or offers to sell to potential customers, sells to customers, and/or uses in the

United States a product, such as a modified website, webpage, or HTML or DOM code for a

website, that was made using its infringing web accessibility tool outside the United States (in,

for example, Israel) by the processes covered by at least Claims 1 and 11 of the '934 patent.

AccessiBe states on its website, for example, that it has servers in the United States and Europe.

78.     AccessiBe's infringement of the '934 patent is willful, deliberate, and intentional

by continuing its acts of infringement after becoming aware of the '934 patent and its

infringement thereof, thus acting in reckless disregard of AudioEye's patent rights.

79.     Because of accessiBe's infringement of the '934 patent, AudioEye has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

80.     Upon information and belief, unless enjoined, accessiBe, and/or others acting on behalf of accessiBe, will continue their infringing acts, thereby causing additional irreparable injury to AudioEye for which there is no adequate remedy at law.

## VII.  THIRD CAUSE OF ACTION

## (INFRINGEMENT OF U.S. PATENT NO. 10,762,280)

81.     AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

82.     Upon information and belief, accessiBe has infringed at least Claims 1 and 15 of the '280 patent under at least 35 U.S.C. § 271(a), (b), and (c).  Upon information and belief, accessiBe has directly infringed at least Claims 1 and 15 of the '280 patent through the manufacture, use, sale, offer for sale, and/or importation into the United States of its infringing web accessibility tool.  For example, upon information and belief, accessiBe's infringing web accessibility tool includes all of the limitations of Claim 1 of the '280 patent as set forth in more detail in Exhibit 7.

83.     Upon information and belief, accessiBe has knowledge of the '280 patent.  On September 4, 2020, before the filing of the complaint, AudioEye sent a letter to accessiBe, identifying the '280 patent and explaining how accessiBe was infringing the patent.  AccessiBe also has knowledge of the '280 patent based on the filing of the complaint.

84.     Upon information and belief, accessiBe has actively induced others to infringe at least Claims 1 and 15 of the '280 patent by marketing and selling to its customers, including

customers in this Judicial District, its infringing web accessibility tool, knowing and intending

that its customers use it in manner that infringes at least Claims 1 and 15 of the '280 patent.  For

example, using the demonstration videos mentioned in Exhibit 7, as well as other training

materials, accessiBe instructs and teaches its customers how to use its tool to infringe at least

Claims 1 and 15 of the '280 patent.  AccessiBe's acts constitute infringement of the '280 patent

in violation of 35 U.S.C. § 271(b).

85.     Upon information and belief, accessiBe's acts constitute contributory

infringement of the '280 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief,

accessiBe contributorily infringes because, for example, accessiBe offers to sell, sells, and/or

imports into the United States components of its infringing web accessibility tool, which are not

a staple article or commodity of commerce suitable for non-infringing use and which accessiBe

knows are especially made or adapted for use in an infringement of at least Claims 1 and 15 of

the '280 patent.

86.     Upon information and belief, accessiBe has also infringed at least Claim 19 of the

'280 patent under at least 35 U.S.C. § 271(a), (b), (c), and (g).

87.     For example, upon information and belief, accessiBe has performed each of the

limitations of Claim 19 of the '280 patent using a computer system in the United States.  Using

its infringing web accessibility tool, accessiBe performs in the United States the recited steps of a

computer implemented method for identifying structural patterns across a plurality of web pages

and determining a set of remediations that can be applied collectively to the plurality of web

pages, as set forth in more detail in Exhibit 7.

88.     Upon information and belief, accessiBe has actively induced others to infringe at

least Claim 19 of the '280 patent by marketing and selling to its customers, including customers

in this Judicial District, its infringing web accessibility tool, knowing and intending that its customers use it in a manner that infringes at least Claim 19 of the '280 patent. For example, using the demonstration videos mentioned in Exhibit 7, as well as other training materials, accessiBe instructs and teaches its customers how to use its tool to infringe at least Claim 19 of the '280 patent. AccessiBe's acts constitute infringement of the '280 patent in violation of 35 U.S.C. § 271(b).

89.    Upon information and belief, accessiBe's acts constitute contributory infringement of the '280 patent in violation of 35 U.S.C. § 271(c). Upon information and belief, accessiBe contributorily infringes because, for example, accessiBe offers to sell, sells, and/or imports into the United States its infringing web accessibility tool, which is not a staple article or commodity of commerce suitable for non-infringing use and which is used in performing the processes covered by at least Claim 19 of the '280 patent, and accessiBe knows its tool is especially made or adapted for use in an infringement of the '280 patent.

90.    Upon information and belief, accessiBe's acts constitute infringement of the '280 patent in violation of 35 U.S.C. § 271(g). Upon information and belief, accessiBe imports into the United States or offers to sell to potential customers, sells to customers, and/or uses in the United States a product, such as a modified website, webpage, or HTML or DOM code for a website, that was made using its infringing web accessibility tool outside the United States (in, for example, Israel) by the processes covered by at least Claim 19 of the '280 patent. AccessiBe states on its website, for example, that it has servers in the United States and Europe.

91.    AccessiBe's infringement of the '280 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '280 patent and its infringement thereof, thus acting in reckless disregard of AudioEye's patent rights.

92.     Because of accessiBe's infringement of the '280 patent, AudioEye has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

93.     Upon information and belief, unless enjoined, accessiBe, and/or others acting on behalf of accessiBe, will continue their infringing acts, thereby causing additional irreparable injury to AudioEye for which there is no adequate remedy at law.

## VIII.  FOURTH CAUSE OF ACTION

### (INFRINGEMENT OF U.S. PATENT NO. 10,809,877)

94.     AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

95.     Upon information and belief, accessiBe has infringed at least Claims 1 and 10 of the '877 patent under at least 35 U.S.C. § 271(a), (b), (c), and (g).

96.     For example, upon information and belief, accessiBe has performed each of the limitations of Claim 1 of the '877 patent using a computer system in the United States.  Using its infringing web accessibility tool, accessiBe performs in the United States the recited steps of a computer implemented method of programmatically assigning a descriptive attribute to an untagged input field in a web page to enable an audible description of the untagged input field, the web page having an associated document object model (DOM), as set forth in more detail in Exhibit 8.

97.     Upon information and belief, accessiBe has knowledge of the '877 patent.  On October 25, 2020, before the complaint was filed, AudioEye sent a letter to accessiBe, identifying the '877 patent and explaining how accessiBe was infringing the patent.  AccessiBe also has knowledge of the '877 patent based on the filing of the complaint.

98.     Further, to the extent that AudioEye asserts only method claims of the '877 Patent, AudioEye is entitled to recover past damages and has complied with 35 U.S.C. § 287.

99.     Upon information and belief, accessiBe has actively induced others to infringe at least Claim 10 of the '877 patent by marketing and selling to its customers, including customers in this Judicial District, its infringing web accessibility tool, knowing and intending that its customers use it in a manner that infringes at least Claim 10 of the '877 patent.  For example, using the demonstration videos mentioned in Exhibit 8, as well as other training materials, accessiBe instructs and teaches its customers how to use its tool to infringe the '877 patent. AccessiBe's acts constitute infringement of the '877 patent in violation of 35 U.S.C. § 271(b).

100.    Upon information and belief, accessiBe's acts constitute contributory infringement of the '877 patent in violation of 35 U.S.C. § 271(c).  Upon information and belief, accessiBe contributorily infringes because, for example, accessiBe offers to sell, sells, and/or imports into the United States its infringing web accessibility tool, which is not a staple article or commodity of commerce suitable for non-infringing use and which is used in performing the processes covered by at least Claim 10 of the '877 patent, and accessiBe knows its tool is especially made or adapted for use in an infringement of the '877 patent.

101.    Upon information and belief, accessiBe's acts constitute infringement of the '877 patent in violation of 35 U.S.C. § 271(g).  Upon information and belief, accessiBe imports into the United States or offers to sell to potential customers, sells to customers, and/or uses in the United States a product, such as a modified website, webpage, or HTML or DOM code for a website, that was made using its infringing web accessibility tool outside the United States (in, for example, Israel) by the processes covered by at least Claim 1 of the '877 patent.  AccessiBe states on its website, for example, that it has servers in the United States and Europe.

102.    AccessiBe's infringement of the '877 patent is willful, deliberate, and intentional by continuing its acts of infringement after becoming aware of the '877 patent and its infringement thereof, thus acting in reckless disregard of AudioEye's patent rights.

103.    Because of accessiBe's infringement of the '877 patent, AudioEye has suffered and will continue to suffer irreparable harm and injury, including monetary damages in an amount to be determined at trial.

104.    Upon information and belief, unless enjoined, accessiBe, and/or others acting on behalf of accessiBe, will continue their infringing acts, thereby causing additional irreparable injury to AudioEye for which there is no adequate remedy at law.

## IX.  FIFTH CAUSE OF ACTION

## (FALSE ADVERTISING UNDER SECTION 43(A) OF THE LANHAM ACT)

105.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

106.    This is a cause of action for False Advertising under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

107.    accessiBe spoofs the WAVE checker to misrepresent the effectiveness of its product.  Also, the statements in accessiBe's advertisements and marketing materials that its product automatically renders websites WCAG and ADA compliant is false and misleading, and misrepresents the characteristics and qualities of its product.

108.    These false and misleading statements deceived, and have a tendency to continue to deceive, a substantial segment of potential consumers.

109.    The deception of these advertisements and marketing materials is material, and has influenced, and will continue to influence, the purchasing decisions of potential customers of

accessiBe and AudioEye, specifically companies and individuals who own or operate internet websites.

110.    AccessiBe offers and sells its product in interstate commerce throughout the United States.  These advertisements and marketing materials have been directed and sent to potential consumers in interstate commerce.

111.    The deceptive advertisements and marketing materials have injured, and are likely to continue to injure, AudioEye.

112.    AudioEye has no adequate remedy at law.

## X.  SIXTH CAUSE OF ACTION

## (PRODUCT DISPARAGEMENT UNDER SECTION 43(A) OF THE LANHAM ACT)

113.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

114.    This is a cause of action for Product Disparagement under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

115.    The statements in accessiBe's advertisements and marketing materials that AudioEye and its product do not render its customers' websites compliant with certain WCAG requirements, rely exclusively on manual remediation and do not leverage automated remediation, cost $5,000-$50,000 per year, do not provide continuous compliance monitoring, and do not provide a customizable interface are false and misleading, and misrepresent the characteristics and qualities of AudioEye and its product.

116.    The false and misleading statements in the advertisements and marketing materials deceived, and has a tendency to continue to deceive, a substantial segment of potential consumers.

117.    The deception of these advertisements and marketing materials is material, and has influenced, and is likely to continue to influence, the purchasing decisions of potential customers of AudioEye, specifically companies and individuals who own or operate internet websites.

118.    AudioEye offers and sells its product in interstate commerce throughout the United States.  These advertisements and marketing materials have been directed and sent by accessiBe to potential consumers in interstate commerce.

119.    The deceptive advertisements and marketing materials have injured, and are likely to continue to injure, AudioEye.  For example, AudioEye has already been forced to expend resources and miss opportunities as a result of running extensive testing on Fingerlakes's website and preparing a report to explain to Fingerlakes how accessiBe's "test" was fraudulent and the report was false, as well as Hoselton's termination of its partner contract with AudioEye. AudioEye has also been forced to expend resources correcting in the media the false and misleading statements of accessiBe. Upon information and belief, but for accessiBe's false and disparaging statements, Hoselton would have continued its contractual relationship with AudioEye.

120.    AudioEye has no adequate remedy at law.

## XI.  SEVENTH CAUSE OF ACTION

### (PRODUCT DISPARAGEMENT UNDER NEW YORK LAW)

121.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

122.    This is a cause of action for Product Disparagement under New York Law.

123.    The statements in accessiBe's advertisements and marketing materials that AudioEye and its product do not render its customers' websites compliant with certain WCAG requirements and that AudioEye and its product rely exclusively on manual remediation and do not leverage automated remediation are disparaging, false, and misleading, and misrepresent the characteristics and qualities of AudioEye and its product.

124.    These disparaging, false, and misleading statements have been published by accessiBe by sending them in reports to consumers in New York, including Fingerlakes, published orally by stating them in at least one sales call to at least one consumer in New York, and included on websites published to potential consumers in New York.  Upon information and belief, accessiBe made these statements to encourage AudioEye's customers to terminate their relationship with AudioEye and to form a relationship with accessiBe.

125.    AccessiBe's actions have injured, and are likely to continue to injure, AudioEye.  For example, AudioEye has already been forced to expend resources and miss opportunities as a result of running extensive testing on Fingerlakes's website and preparing a report to explain to Fingerlakes how accessiBe's "test" was fraudulent and the report was false, as well as Hoselton's termination of its partner contract with AudioEye.  Upon information and belief, but for accessiBe's false and disparaging statements, Hoselton would have continued its contractual relationship with AudioEye.

126.    AudioEye has no adequate remedy at law.

## XII.  EIGHTH CAUSE OF ACTION

### (SLANDER/DEFAMATION UNDER NEW YORK LAW)

127.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

128.    This is a cause of action for Slander/Defamation under New York Law.

129.    AccessiBe falsely disparaged AudioEye and its integrity by stating to at least one potential consumer in New York on at least one sales call that AudioEye misleads its customers and extracts higher prices from its customers by claiming manual remediation is required.  Also, by sending Fingerlakes a report falsely claiming that AudioEye's product did not render Fingerlakes's website compliant with certain WCAG requirements, accessiBe disparaged the reputation of AudioEye and its competence.

130.    Upon information and belief, accessiBe made these statements to encourage AudioEye's customers to terminate their relationship with AudioEye and to form a relationship with accessiBe.

131.    AccessiBe's actions have injured, and are likely to continue to injure, AudioEye.  For example, AudioEye has already been forced to expend resources to correct in the media the false and disparaging statements of accessiBe.  Also, upon information and belief, but for accessiBe's false and disparaging statements, Hoselton would have continued its contractual relationship with AudioEye.

132.    AudioEye has no adequate remedy at law.

## XIII.  NINTH CAUSE OF ACTION

## (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE UNDER NEW YORK LAW)

133.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

134.    This is a cause of action for Tortious Interference with Prospective Economic Advantage under New York law based on accessiBe's improper business practices used to target

and interfere with the relationships between AudioEye and its customers, including AudioEye's

relationships with Fingerlakes and Hoselton.

135.    AudioEye had a contractual relationship with Fingerlakes and Hoselton to provide

web accessibility technology and services.

136.    Upon information and belief, accessiBe knew of that relationship based on, at

least in part, accessiBe's knowledge and investigation of AudioEye's business, as exemplified

by, for example, the explicit characterization on accessiBe's website of AudioEye as a

competitor and its explicit comparisons between its product and AudioEye's business.  Upon

information and belief, accessiBe also knew of that relationship because AudioEye's toolbar

showed up on Fingerlakes's and Hoselton's websites upon loading and because references to

AudioEye appear in the JavaScript on those sites.

137.    Upon information and belief, accessiBe interfered with the relationship between

AudioEye, on the one hand, and Fingerlakes and Hoselton, on the other hand, based on, at least

in part, the improper business practices set forth above, including accessiBe's interfering with

AudioEye's software code to generate false accessibility reports, spoofing third-party

accessibility checkers to misrepresent the effectiveness of its product, making additional

misrepresentations on its website and in the media about the effective of its product, and making

false and disparaging comments about AudioEye's business, including AudioEye's pricing and

installation times, all of which were directed toward Fingerlakes and Hoselton in New York.

138.    Upon information and belief, accessiBe's interference with AudioEye's

relationship with Fingerlakes and Hoselton was intentional based, at least in part, on accessiBe's

knowledge and investigation of AudioEye's business, as exemplified by, for example, the

explicit characterization on accessiBe's website of AudioEye as a competitor, accessiBe's

explicit comparisons between its product and AudioEye's business, as well as accessiBe's stated

intent to gain market share from its competitors in the web accessibility space.  Upon

information and belief, accessiBe's interference was also intentional because accessiBe was

aware of AudioEye's relationship with Fingerlakes and Hoselton, as set forth above.  Upon

information and belief, accessiBe is targeting AudioEye's customers.

139.    Upon information and belief, accessiBe's interfering with AudioEye's software

code to generate false accessibility reports, spoofing third-party accessibility checkers to

misrepresent the effectiveness of its product, making additional misrepresentations on its website

and in the media about the effective of its product, and making false and disparaging comments

about AudioEye's business, including AudioEye's pricing and installation times, was dishonest,

unfair, and improper.

140.    AudioEye was injured by accessiBe's interference with AudioEye's relationship

with Fingerlakes and Hoselton based, at least in part, on the resources it was required to expend

and the opportunities it missed as a result of running extensive testing on Fingerlakes's website

and preparing a report to explain to Fingerlakes how accessiBe's "test" was fraudulent and the

report was false, as well as Hoselton's termination of its partner contract with AudioEye.  Upon

information and belief, but for accessiBe's intentional interference, Hoselton would have

continued its contractual relationship with AudioEye.

141.    Upon information and belief, accessiBe's interfering with AudioEye's software

code to generate false accessibility reports, spoofing third-party accessibility checkers to

misrepresent the effectiveness of its product and making additional misrepresentations about the

effectiveness of its product, and making false and disparaging comments about AudioEye's

business, amounts to an independent tort, including fraud, deceptive business practices, and disparagement.

142.    AudioEye has been, and will continue to be, damaged by accessiBe's actions in an amount to be determined at trial.

143.    AccessiBe has caused, and will continue to cause, irreparable injury to AudioEye unless restrained by the Court.

## XIV.  <u>TENTH CAUSE OF ACTION</u>

## (DECEPTIVE BUSINESS PRACTICES UNDER NEW YORK GENERAL BUSINESS LAW §§ 349 AND 350)

144.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

145.    This is a cause of action for Deceptive Business Practices Under New York General Business Law §§ 349 and 350

146.    Upon information and belief, accessiBe's improper conduct, including accessiBe's interfering with AudioEye's software code to generate false accessibility reports and spoofing third-party accessibility checkers to misrepresent the effectiveness of its product was oriented toward consumers, including toward Fingerlakes and Hoselton in New York, and was materially misleading.  AccessiBe's acts of deception threaten the public interest at least because they threaten to keep important internet content inaccessible to individuals with disabilities.

147.    Upon information and belief, accessiBe's improper conduct toward Fingerlakes and Hoselton was intentional based, at least in part, on accessiBe's knowledge and investigation of AudioEye's business, as exemplified by, for example, the explicit characterization on accessiBe's website of AudioEye as a competitor, accessiBe's explicit comparisons between its

product and AudioEye's business, as well as accessiBe's stated intent to gain market share from its competitors in the web accessibility space.  Upon information and belief, accessiBe's conduct toward Fingerlakes and Hoselton was also intentional because accessiBe was aware of AudioEye's relationship with Fingerlakes and Hoselton, as set forth above.  Upon information and belief, accessiBe is targeting AudioEye's customers.

148.    As a result of accessiBe's improper conduct, AudioEye was injured based, at least in part, on the resources it was required to expend and the opportunities it missed as a result of running extensive testing on Fingerlakes's website and preparing a report to explain to Fingerlakes how accessiBe's "test" was fraudulent and the report was false.  AudioEye was also injured based on Hoselton's termination of its partner contract with AudioEye.  Upon information and belief, but for accessiBe's intentional interference, Hoselton would have continued its contractual relationship with AudioEye.

149.    AudioEye has been, and will continue to be, damaged by accessiBe's actions in an amount to be determined at trial.

150.    AccessiBe has caused, and will continue to cause, irreparable injury to AudioEye unless restrained by the Court.

## XV.  ELEVENTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)

151.    AudioEye hereby realleges and incorporates by reference the allegations set forth in the above paragraphs.

152.    This is a cause of action for Unjust Enrichment.

153.    Upon information and belief, based on the improper business practices set forth above, accessiBe improperly obtained a contract and payment from Hoselton.  As a result,

accessiBe was unjustly enriched at the expense of AudioEye.  It is against good conscience and equity to permit accessiBe to retain what it acquired from Hoselton at the expense of AudioEye.

154.    AccessiBe should be required to disgorge and repay all improper benefits obtained at the expense of AudioEye and through its improper business practices.

### XVI.  JURY DEMAND

155.    AudioEye hereby demands a jury on all issues so triable.

### XVII.  PRAYER FOR RELIEF

**WHEREFORE**, AudioEye prays for judgment in its favor against accessiBe for the following relief:

A.    Pursuant to 35 U.S.C. § 271, a determination that accessiBe and its officers, agents, servants, employees, attorneys, and all others in active concert and/or participation with it have infringed literally and/or under the doctrine of equivalents each of the '709, '934, '280, and '877 patents;

B.    Pursuant to 35 U.S.C. § 283, an injunction enjoining accessiBe and its officers, agents, servants, employees, attorneys, and all others in active concert and/or participation with it from infringing the '709, '934, '280, and '877 patents;

C.    Pursuant to 35 U.S.C. § 284, an award compensating AudioEye for accessiBe's infringement of the '709, '934, '280, and '877 patents;

D.    Pursuant to 35 U.S.C. § 284, an award increasing damages up to three times the amount found or assessed by the jury for accessiBe's infringement of the '709, '934, '280, and '877 patents in view of the willful and deliberate nature of the infringement;

E.      Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and an award of AudioEye's reasonable attorneys' fees and non-taxable costs;

F.      An injunction enjoining accessiBe and its officers, agents, servants, employees, attorneys, and all others in active concert and/or participation with it from its improper business practices, including its false advertising, product disparagement, defamation, tortious interference and deceptive business practices;

G.      An award of statutory and/or actual damages for accessiBe's improper business practices, including its false advertising, product disparagement, defamation, tortious interference and deceptive business practices;

H.      An award of disgorgement and/or repayment for any unjust enrichment by accessiBe;

I.      An aware of punitive damages and/or treble damages for accessiBe's improper business practices, including its tortious interference and deceptive business practices;

J.      Any other relief that this Court may deem just.

October 26, 2020                         Respectfully submitted,

                                         /s/ *Brian C. Nash*
                                         Brian C. Nash
                                         Texas Bar No. 24051103
                                         Austin Schnell
                                         Texas Bar No. 24095985
                                         Pillsbury Winthrop Shaw Pittman LLP
                                         401 Congress Ave., Suite 1700
                                         Austin, Texas 78701
                                         T: (512) 580-9600 F: (512) 580-9601
                                         E: brian.nash@pillsburylaw.com
                                         E: austin.schnell@pillsburylaw.com

Steven Jensen (pro hac vice to be filed)
CA Bar No. 149894
Jared Bunker (pro hac vice to be filed)
CA Bar No. 246946
Knobbe Martens
2040 Main Street
Irvine, CA 92614
T: (949) 760-0404
E: jared.bunker@knobbe.com
E: steve.jensen@knobbe.com

*Attorneys for Plaintiff AudioEye, Inc.*