**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

AUDIOEYE, INC.,

               Plaintiff,

     v.

ACCESSIBE LTD.,

               Defendant.

Case No. 6:20-cv-997-ADA

Honorable Alan D. Albright

## DEFENDANT ACCESSIBE'S REPLY CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     LEVEL OF ORDINARY SKILL ....................................................................... 1

III.    CLAIM TERMS .................................................................................................. 2

        A.      Headless browser .................................................................................... 2

        B.      Alt text / alt text description / alt text tag............................................. 3

        C.      Crawling.................................................................................................. 4

        D.      Map/mapping .......................................................................................... 6

        E.      Assigning . . . based on the determined file path ................................. 7

        F.      Adequate/inadequate [alt text / descriptive attribute] .......................... 8

        G.      Heuristic engine ................................................................................... 10

        H.      Machine learning [algorithm/engine/system] ..................................... 14

        I.      Contextual cues..................................................................................... 16

        J.      Artificial intelligence algorithm........................................................... 16

        K.      [The] computer system ......................................................................... 19

        L.      Assessing a validity of a . . . descriptive attribute............................... 20

IV.     CONCLUSION.................................................................................................. 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
    830 F.3d 1341 (Fed. Cir. 2016)................................................................ *passim*

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002)....................................................................19

*Am. Imaging Servs., Inc. v. Intergraph Corp.*,
    2000 WL 772725 (Fed. Cir. 2000)................................................................21

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
    618 F.3d 1354 (Fed. Cir. 2010)....................................................................20

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)......................................................................5

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002)......................................................................20

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)......................................................................8

*Digital Retail Apps, Inc. v. H-E-B, LP*,
    No. 6-19-CV-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) .......................20, 21

*EON Corp. IP Holdings LLC v. AT & T Mobility LLC*,
    785 F.3d 616 (Fed. Cir. 2015)......................................................................17

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008)....................................................................18

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013)....................................................................15

*Gradient Enters., Inc. v. Skype Techs. S.A.*,
    No. 10-cv-6712L, 2015 WL 5567926 (W.D.N.Y. Sept. 22, 2015) .........................................15

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
    732 F.3d 1376 (Fed. Cir. 2013)....................................................................15

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014)......................................................................9

*Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*,
    No. 1-14-CV-134-LY, 2015 WL 4937464 (W.D. Tex. Aug. 18, 2015)............................14, 15

*Lemaire Illumination Techs., LLC v. HTC Corp.*,
    No. 2:18-cv-00021-JRG, 2019 WL 1996676 (E.D. Tex. May 6, 2019) .....................6, 7, 9, 10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..............................................................................................................20

*Noah Sys., Inc. v. Intuit, Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)........................................................................................11, 15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)................................................................................................4

*Parity Networks, LLC v. ZyXEL Commc'ns, Inc. et al.*,
    No. 20-697-JVS (KESx), 2020 WL 8569299 (C.D. Cal. Dec. 22, 2020)....................... *passim*

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).........................................................................................4, 5

*Skky, Inc. v. MindGeek, S.A.R.L.*,
    859 F.3d 1014 (Fed. Cir. 2017)...................................................................................12, 15, 18

*Triton Tech of Texas LLC, v. Nintendo of Am., Inc.*,
    753 F.3d 1375 (Fed. Cir. 2014).............................................................................................18

## I.      INTRODUCTION

Plaintiff's across-the-board position against construing highly technical computer and web accessibility terms of art is inconsistent with the law and the patents at issue in this case. Where Plaintiff does present alternative constructions, they are far divorced from any possible plain and ordinary meaning (further evidencing the need for construction), and are—in fact—uncommon or special definitions supported by neither intrinsic or extrinsic evidence.  Plaintiff also alleges that various means-plus-function terms, such as "artificial intelligence algorithm," denote well-understood structures but can point the Court to no such structures in the art other than some specialized, undisclosed algorithm.

## II.     LEVEL OF ORDINARY SKILL

The parties largely agree as to the appropriate level of ordinary skill in the art with one exception:  accessiBe proposes a definition that requires two years of experience with developing software with accessibility applications, rather than Plaintiff's proposed two years of experience developing and commercializing websites, web applications, and distributed software systems generally.  *Compare*  D.I. 36 at 6-7 *with* D.I. 36-13 (Fogarty IPR Decl.), ¶ 34.   The patents in dispute are specifically directed to accessibility and making websites compliant with accessibility guidelines such as WCAG, rather than to general website design.  *See, e.g.*, D.I. 36-3 ("'934 patent") at 1:7-15, 2:10-15; *see also* Declaration of James Fogarty, Ph.D ("Fogarty Decl.") ¶¶ 19-22.  That most websites are not accessible as developed confirms that general website designers lack the expertise and knowledge of accessibility guidelines and compliance rules that form the bases for these patents.  Regardless, Defendant's arguments would not change even if Plaintiff's proposal were adopted.  While Plaintiff's expert appears to lack experience developing software with accessibility applications, Defendant's expert would qualify under either definition.

III.   **CLAIM TERMS**

A.   **Headless browser**[1]

Plaintiff's proposed construction boils down to two flawed arguments.  First, Plaintiff argues that because the specification does not explicitly define a headless browser, it is not constrained by references reflecting the understanding in the art and are free to deviate from the standard technical meaning of the terms.  Second, Plaintiff argues that because the specification discloses the use of headless browsers "to programmatically test a collection of web pages," any browser that can be controlled by software necessarily constitutes a "headless browser."  Not so.

As is commonly understood in the art, a "headless" browser is one without a graphical user interface.  *See, e.g.*, D.I. 33-1; D.I. 33-2; Fogarty Decl. ¶¶ 29-31.  Every example of a headless browser in the specification—including Firefox—confirms this understanding.  *See* D.I. 36-2 ("'709 patent") at 15:53-54; '934 patent at 5:53-54;  D.I. 33-2 (Headless Chrome is a way to run the Chrome browser in an environment *where you don't need a visible UI shell*); Fogarty Decl. ¶¶ 29-30, Ex. G ("For years, the best way to load webpages *without displaying UI* was PhantomJS, which is based on WebKit. . . . Google shipped Chrome 59 featuring a headless mode, and *Firefox has followed close behind with headless mode*."), Ex. F ("Since PhantomJS is headless, there will *not be anything visible shown up on the screen*."), Ex. D ("A headless browser is a term used to define browser simulation programs that *do not have a GUI*.") (emphases added).

Plaintiff has not identified a single reference to a headless browser in the intrinsic or extrinsic record that actually indicates that software-controlled operation is what makes a browser "headless."  Although it is true that headless browsers are especially useful for automated testing, that is not what makes them "headless."  Rather, headless browsers are used for automated testing

---

[1] The patents and claims in which each term appears, and each party's proposed construction, is set forth in accessiBe's Opening Brief.

because the tests run faster without a graphical user interface (i.e., the application's "head," which is unneeded because there is no "user" viewing the display).  In this way, accessiBe's construction is entirely consistent with the specification's disclosure of how headless browsers can be used.  But it does not follow, as Plaintiff suggests, that *all* browsers under the control of software are necessarily headless, or that headless browsers can only be software-controlled.  To the contrary, a person of ordinary skill ("POSA") would have understood that browsers with GUIs could also be used for automated testing, but that use does not make them headless.  *See* Fogarty Decl. ¶ 31.

**B.      Alt text / alt text description / alt text tag**

The dispute is not whether "alt text" is shorthand for alternative text; the dispute is over whether alt-text (or alternative text) would have been understood to refer to the text in the "alt" attribute, or whether the term broadly encompasses any descriptive text inserted in other attributes, such as "titles," "labels," and the like.  Plaintiff intends to make mischief by arguing that alt text simply means alternative text, and then attributing a meaning to "alternative text" that is far broader than used in the patent.  Alt-text (or alternative text) is one example of descriptive text that can be inserted through an HTML attribute; it does not encompass every type of descriptive text. *See, e.g.*, '934 patent at 10:10-17 (calling "labels," "analogous to a picture's alt text"); '709 patent, claim 18 (separately claiming compliance issues such as ". . . missing or inadequate ***ALT-text***, iFrames missing ***titles***, disordered ***headers***, heading level issues, inputs missing ***labels***, or links missing ***labels***.").  Plaintiff's brief does not actually address this distinction.

Plaintiff's reliance on the disclosure of injecting alt-text into the DOM is similarly misplaced.  It simply misstates the relationship between a website's HTML code and a DOM, which is a tool to access and edit that code with software.  Indeed, the patents explain that:

> The HTML DOM is a standard object model and programming interface for
> HTML, and defines the properties of all HTML elements and the methods to access

> the HTML elements. In other words, the HTML DOM is a standard for how to get,
> change, add, delete, or otherwise interact with HTML elements.

'934 patent at 4:5-24.  Put another way, the DOM is simply a way to represent the HTML code in

software, and HTML elements can be changed, added, or deleted with the DOM.  That alt-text can

be injected into the DOM (i.e. using the DOM to edit the HTML elements) does not change the

fact that the text is associated with an alt HTML attribute.  *See also* Fogarty Decl. ¶ 32.

### C.    Crawling

As an initial matter, the "crawling . . ." terms must be construed because the term has

multiple meanings.  Plaintiff's brief all but admits the claims use "crawling" in its technical sense

rather than the common meaning of moving on hands and knees.  *Compare* D.I. 33 at 12-14 *with*

D.I. 36 at 15-19.  It is well-settled that terms must be construed where there is more than one

meaning for the term or where the term is highly technical, as is the case here.  *See, e.g.*, *O2 Micro*

*Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Once properly

construed, these terms become indefinite since a DOM – or some unnamed object associated with

a web page – cannot be crawled.  *See* D.I. 33 at 10-14; *see also* Fogarty Decl. ¶¶ 33-34.

Defendant's proposed construction is consistent with the common technical definition of

"crawling," as evidenced by the specification and cited technical dictionaries.  D.I. 33 at 11-12

(citing specification, technical dictionaries, and textbooks); *see also* *Phillips v. AWH Corp.*,

415 F.3d 1303, 1318 (Fed. Cir. 2005) (technical dictionaries are especially helpful in construing

technical terms).  By contrast, Plaintiff eschews the commonly accepted meaning of the term in

favor of inventing a definition that is supported by nothing but its expert's conclusory opinion.

D.I. 36 at 16-19.  Indeed, Plaintiff's proposed construction of a "structured navigation" does not

appear in either the intrinsic or extrinsic evidence and it is unclear what a "structured navigation"

would even be.  Although Plaintiff argues that crawling must necessarily cover inspecting a single

web page because the patent describes crawling a "starting page" or "starting URL," *see* D.I. 36 at 16-17, this ignores the "*starting*" portion of starting page/URL.  A *starting* page clearly indicates that the crawling occurs over multiple pages, consistent with Defendant's proposal and the standard technical meaning of the term.  Indeed, the idea of "crawling" or "spidering" is intimately tied to the idea that the World Wide Web is a "*web*" of interconnected pages.  One cannot crawl/spider a single node, as the act of crawling or spidering consists of moving from one node to another.  *See, e.g.*, D.I. 33-6 at ACCB00022991; *see also, e.g.*, D.I. 33-5 at ACCB00022917; Fogarty Decl. ¶¶ 33-34.  And because crawling necessarily involves traversing and gathering multiple web pages, the claims reciting "crawling" a single DOM are indefinite.

Plaintiff's expert provides no meaningful analysis to support Plaintiff's proposed construction, merely stating the conclusory opinion that the specifications provide sufficient details to allow a POSA to understand the plain and ordinary meaning of the terms.  D.I. 36-11 at 8; *see also Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").  But this fails to address the facts that Plaintiff's proposed construction of "a structured navigation . . ." is: (1) inconsistent with the technical dictionary definitions; and (2) not found in any of the patents' specifications.  In sum, there is no support for Plaintiff's proposal.

The prosecution history shows that Plaintiff disclaimed a broad definition of "crawling." D.I. 33 at 12-13.  More specifically, the USPTO rejected the claims because that prior art references disclosed the step of "travers[ing] (i.e., inspect[ing])" the DOM.  Supplemental Declaration of Lucas Dahlin ("Dahlin Suppl. Decl."), Ex. 30 (10/29/18 Non-Final Rejection) at 4-5.  In response, Plaintiff amended the claims to replace "inspecting" with "crawling."  D.I. 36-14 at 2.  This is clear and unmistakable disclaimer.  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314

F.3d 1313, 1327 (Fed. Cir. 2003) ("an amendment to overcome a rejection" is a clear disavowal of claim coverage) (internal citation omitted).  Plaintiff's proposed construction of a "structured navigation" of a DOM/web page is an improper attempt to reclaim "inspecting" a DOM/web page, scope that was disclaimed during prosecution.

Finally, Plaintiff argues that Claim 11 of the '934 patent is not indefinite, despite failing to recite *what* is being crawled, because "[m]any elements associated with a web page can be crawled," such as "DOM, HTML elements, links, nodes, and metadata."  The claim, however, does not recite crawling elements, let alone any of the examples that Plaintiff provides of what could possibly be crawled.  The claim language does not make sense and Plaintiff's non-limiting list of possible objects or elements which could allegedly be "crawled" evidences that the scope of this claim is unclear in view of the missing object.

## D.    Map/mapping

The terms "map" and "mapping" are used in the context of the asserted patents in their commonly understood mathematical sense.  Construction is necessary because the term is technical in nature, and the lay understanding (using cartography to draw a physical map) has no relevance here.  *See Lemaire Illumination Techs., LLC v. HTC Corp.*, No. 2:18-cv-00021-JRG, 2019 WL 1996676, at *7 (E.D. Tex. May 6, 2019).  As explained in accessiBe's Opening Brief, accessiBe's proposed construction is consistent with this common understanding and supported by the specification.  When a compliance issue is mapped to a pre-existing remediation script, there is a correspondence assigned between that compliance issue and remediation script.

Rather than contest accessiBe's actual proposed construction, Plaintiff deliberately misreads the proposed construction in order to invent something to attack.  Nothing in accessiBe's proposed construction requires a one-to-one correspondence, as Plaintiff contends.  accessiBe's proposal merely requires that a correspondence be assigned between an element of one set

(e.g., a compliance issue) and an element of a second set (e.g., a pre-existing remediation script). There is no requirement that each compliance issue correspond to a unique remediation script.

Plaintiff's proposal of "correlating" not only highlights the need to construe the term, but also illustrates why accessiBe's proposal is true to the specification and the claims. "Correlating" involves specifying the degree in which one thing depends on another, and can include negative correlations. Plaintiff does not actually dispute that this is the meaning of "correlate." Rather, it criticizes accessiBe for offering no support for this interpretation (while suspiciously, omitting any support for its own "common sense" understanding of the term).[2]   Simply put, the word "correlate" makes no sense in the context of these claims. Plaintiff's proposal should be rejected.

**E.     Assigning . . . based on the determined file path**

The parties agree that a "file path" is a string of characters that identifies a file and its location. *See* D.I. 36 at 22 ("A 'file path' is simply a string of characters used to locate a file, and the '934 Patent uses the term in this ordinary way"). To the extent Plaintiff disagrees with accessiBe's proposed construction, its criticisms reflect a misunderstanding of accessiBe's proposed construction. For example, Plaintiff argues that the word "uniquely" is unsupported by the specification because "a file can be located using multiple file paths, such as a relative path or an absolute path." But accessiBe does not dispute that multiple file paths can point to the same file. *Id.* Rather, a file path (as opposed to a folder path), identifies a unique file (not multiple files). Similarly, Plaintiff contends that the phrase "directory structure" is unsupported by the specification because a file path could specify a target website of a link. *Id.* at 23. But the HTML

---

[2] To the extent additional support is required, *see* Dahlin Suppl. Decl., Ex. 29 (*American Heritage Dictionary,* 5th Ed. (2020) (defining "correlate" as "to establish or demonstrate as having a correlation" or "to be related by a correlation" and "correlation" as "1. A relationship or connection between two things based on co-occurrence or pattern of change: *a correlation between drug abuse and crime.* 2. *Statistics* The tendency for two values or variables to change together, in either the same or opposite way").

files that make up websites *are in directory structures*. *See* Fogarty Decl. ¶ 35 ("Websites are also understood to be organized in directory structures so the phrase 'in a directory structure' does not limit the term as Plaintiff suggests.").

Furthermore, "based on" should not be written out of the claim. Plaintiff's construction replaces the term "based on" with the broader term "using." According to Plaintiff, assigning an alt text description "based on" the determined file path does not require that the description be rooted in the actual string of characters making up the file path, but rather encompasses assigning a description rooted in the contents of the file itself because doing so "uses" the file path. This is not how a POSA reading the '934 patent would have understood the phrase, and Plaintiff has identified no express construction in the specification that would justify writing "based on" out of the claim. Plaintiff's proposal should thus be rejected.

### F.      Adequate/inadequate [alt text / descriptive attribute]

Plaintiff argues that the specifications provide a special definition for "adequate" / "inadequate" where they state that "inadequate" text is limited to "missing or default alt text." D.I. 36 at 26. To support this uncommon construction, Plaintiff misleadingly quotes two passages from the '934 and '280 specifications. In the first cited portion, the two phrases are not even in the same sentence. *See id.* (citing '934 patent at 9:1-9). The second cited portion does not even mention "adequate"/"inadequate" alt text, and merely notes that "[i]n some embodiments, common issues which may be automatically remediated may include . . . text alternatives missing from non-text content." D.I. 36-4 ('280 patent) at 12:58-64. There is simply no support in the specification that "inadequate alt text" means "missing or default text."

Missing or default alt text are – at most – *examples* of inadequate alt text, and do not provide any guidance on the *boundaries* of these terms. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) (for "facially subjective terms, the definiteness

requirement is not satisfied by merely offering examples that satisfy the term within the specification"); *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371–73 (Fed. Cir. 2014) (finding a single example of the term "unobtrusive manner" in the specification did not outline the claims to a skilled artisan with reasonable certainty).  Plaintiff argues these cases are inapposite where the specifications allegedly provide guidance on objective *boundaries* for these terms, rather than merely non-limiting examples, but Plaintiff is unable to recite what these boundaries allegedly are.  *See* D.I. 36 at 26-27.  Indeed, the specifications suggest that missing and inadequate alt text are *not* coextensive.  *See, e.g.*, '709 patent at 5:28-35 (describing "missing *or* inadequate alt text").

Under Plaintiff's proposed construction, an "adequate" description of a picture of the Statue of Liberty could be "a lady", "a yellow ball" or even "asdfasdf."  So long as a description is present and not default text, it is "adequate" to Plaintiff.  But "adequate" does not mean the same thing as "any," and such a construction is inconsistent with: (1) the specifications of the patents, which tie the adequacy of alt text to various accessibility standards, such as WCAG; (2) the extrinsic evidence, including from the WCAG, confirming there is no accepted test for when alt text is adequate; and (3) common sense regarding the plain and ordinary meaning of "adequate" / "inadequate."  *See* D.I. 33 at 19-23.  For example, the WebAIM guidance that Defendant cited in is opening brief (notes that adding the alt text description of "Read More" to an image of George Washington is not adequate alt text because the words do not describe the function of the image; however, since "Read More" is not a default or missing value, it would be considered adequate under Plaintiff's proposal.  *See, e.g.*, D.I. 33-12 at ACCB00023159.  Indeed, the WCAG and other standards require alt text to "convey the same function or purpose as the image" in order to meet

guidelines.  *See id.* at 21-22.  But WCAG and others concede the level of detail required remains unknown.  *See id.* at 19-23.  "More than a missing or default value," however, is not enough.[3]

Finally, Plaintiff argues that additional language surrounding the claim term in the '947, '691 and '173 patents "limits the claims to a particular type of inadequate descriptive attribute" and thus provides objective boundaries on the scope of the terms.  D.I. 36 at 28 (citing, e.g., '947 patent at 19:5-9).  However, in claim 10 of the '947 patent, the "untagged element" actually refers to an element that was previously remediated (D.I. 33 at 42-43), and thus the claim provides no guidance on what standard of adequacy applies.  For the remaining claims, Plaintiff's proposed construction equates a present tag to an adequate tag, which would effectively read "lacking an adequate descriptive attribute" out of those claims.  Further, dependent claim 16 of the '877 patent confirms that inadequate descriptive text is not simply missing text (or an untagged element) as it requires an analysis of whether the descriptive attribute is *erroneous*.  D.I. 36-5 at 20:53-57.  The lone case that Plaintiff cites in support of its position, *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, is inapplicable, as the court in that case held a claim term was not indefinite because "the meaning of the term . . . is unambiguously set forth in the specification."  161 F.3d 696, 706 (Fed. Cir. 1998).  Here, there is no unambiguous definition of "adequate"/"inadequate" in the specification.  Because these terms are purely subjective and lack any objective scope in the intrinsic or extrinsic evidence, they are indefinite.

### G.    Heuristic engine

The heuristic engine terms are indefinite because the specifications fail to disclose an algorithm or a series of steps that the heuristic engine performs.  Plaintiff argues that a POSA could

---

[3] Plaintiff's argument that accessiBe understood the term during the related IPR proceedings fails to recognize basic legal principles of invalidity.  The patent lists non-limiting examples as missing or default alt-text.  Any prior art reciting these same examples would thus disclose these claim elements.  This does not mean that the objective boundaries of the claim term can be understood.

understand what these words mean (D.I. 36 at 28-29), but the standard is not whether the words can be defined.  "[T]he key test is whether the term '*recit[es] sufficient structure* for performing th[e] function."  *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016) (internal citation omitted) (emphasis added).  Plaintiff does not explain what the supposedly known structure is for a "heuristic engine."  Nor could it, as the claimed "heuristic engine" is just software for performing the claimed functions, and thus falls within § 112(f).  Indeed, Plaintiff does not dispute that the heuristic engine is functionally claimed in at least certain claims, nor that the specifications fail to disclose any algorithms for the heuristic engine.

Plaintiff argues that "heuristic engine" is not a means-plus-function term because "heuristics" connotes a particular structure and thus does not fall under § 112(f).  D.I. 36 at 29-30. But "approximating a solution to a problem" is not a structure, and Plaintiff does not, and cannot state, what the structure could possibly be, other than undisclosed software algorithms.  When a claim recites software performing a function, the specification must disclose an algorithm for performing that function.  *Noah Sys., Inc. v. Intuit, Inc.,* 675 F.3d 1302, 1312 (Fed. Cir. 2012).

Plaintiff relies heavily on *Apple, Inc. v. Motorola, Inc.*, but *Apple* relied on the now-overturned standard that there is a "'strong' and 'not readily overcome' [presumption against finding that §112(f) applies] and, as such, [courts] have 'seldom' held that a limitation without recitation of 'means' is a means-plus-function limitation."  757 F.3d 1286, 1297 (Fed. Cir. 2014), *overruled by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (internal citation omitted).  Even under the old standard, the Federal Circuit did not find that the term "'heuristic,' by itself, connotes sufficient structure to maintain the presumption against means-plus-function claiming."  *Id.* at 1301.  And here, unlike in *Apple*, "heuristic" is merely paired with a nonce term, "engine," which does not provide structure.  *Parity Networks, LLC v. ZyXEL*

*Commc'ns, Inc. et al.*, No. SACV 20-697-JVS (KESx), 2020 WL 8569299, at \*6 (C.D. Cal. Dec. 22, 2020) ("'engine' is a classic nonce term . . . and is therefore a 'nonce word that can operate as a substitute for 'means' in the context of [§ 112(f)].'").  Indeed, Plaintiff does not dispute that "heuristic engine" represents some type of software for performing the claimed functions.

The other case Plaintiff relies on is also inapplicable here.  D.I. 36 at 29-31 (citing *Skky, Inc. v. MindGeek, S.A.R.L.*, 859 F.3d 1014 (Fed. Cir. 2017).  In *Skyy*, the Federal Circuit held that the term "wireless device means" did not invoke §112(f) because the "wireless device" term itself, as commonly used, denoted a sufficient structure.  *Id.* at 1020.  And indeed, a lay person would understand what a "wireless device" is and could point to a physical object (e.g., a cell phone) as an example.  The Federal Circuit held that this was sufficient, even if a "wireless device" could cover a broad class of structures.  *Id.* at 1019-20.  In contrast, the term "heuristics" denotes an approach to problem solving with no associated structure.  A lay person could not point to a "heuristics" device or understand what the corresponding structure might be.  Nor does Plaintiff explain what structure it commonly refers to.  *See* D.I. 36 at 30.  Instead, Plaintiff merely points to dictionary definitions confirming that "heuristics" can be defined and argues that it means the "general operation of performing a task by approximating a solution to a problem."  *Id.* But Plaintiff's definition does not denote any structure or any algorithm or series of steps.  And the fact that Defendant was able to define "heuristics" in the related IPR proceedings does not mean that the term denotes sufficient structure.

The facts here more closely resemble those in *Advanced Ground*, where the Federal Circuit held that the claim term "symbol generator" was a means-plus-function term subject to §112(f). 830 F.3d at 1346.  The court held as such even though the claim did not use the word "means" and plaintiff's expert testified that "the terms 'symbol' and 'generator' are known within the field of

computer science" and would readily understood by a POSA to refer to a "well-known class of existing, available, standard modules of software code." *Id.* at 1347–48.  According to the Federal Circuit, "[i]rrespective of whether the terms 'symbol' and 'generator' are terms of art in computer science, the *combination* of the terms as used in the context of the relevant claim language suggests that it is simply an abstraction that describes the function being performed." *Id.* at 1348 (emphasis in original).  Similarly, here, it does not matter whether the terms "heuristics" and "engine" are well-known in the field – the *combination* of these terms does not represent a known structure and, at most, just like the "symbol generator" term, represents various types of software for performing the claimed function.  *See id.* (holding "the term 'symbol generator' does not describe anything structural" even if it refers to a well-known class of software).

Next, Plaintiff argues that "heuristic engine" is not subject to § 112(f) because claims 6 and 20 of '934 patent do not recite functions performed by the heuristic engine.  This is wrong for many reasons.  First, this ignores the fact that claims 6 and 20 are dependent claims and that the functions being performed by the heuristics engine, such as mapping compliance issues to pre-existing remediation scripts, are recited in independent claims 1 and 11.  *See* '934 patent at 18:33-54, 19:16-20:4 (reciting computer system performing functions of, e.g., "mapping the one or more compliance issues to one or more pre-existing remediation scripts"); *see also id.* at 8:59-61 ("Using a heuristics engine **503**, detected compliance issues are mapped to pre-existing remediation scripts **504**.").  Second, Plaintiff concedes that the "heuristics engine" term *is* functionally claimed in claims 5 and 19 of the '120 patent, which recite largely the same function as in the '934 patent claims: "a heuristics engine *used to map the identified compliance issue to a pre-existing remediation code*."  D.I. 36-9 ("'120 patent") at 35:56-59, 38:8-11 (emphasis added).

Finally, Plaintiff's alternative proposed construction of "an engine that performs a task by approximating a solution to a problem" is both confusing and unduly broad. There is no way to tell whether software performs a task by approximating a solution to a problem where, outside of actual mathematics, nearly anything could be considered "approximating a solution to a problem." Indeed, when determining appropriate alt text to insert for remediating websites, there is no "perfect" solution and any remediation is an approximation of a solution. Regardless, Plaintiff's proposed construction would *still* fall under §112(f) where it describes "an engine" for performing a task, and where the engine clearly refers to some undisclosed software algorithm rather than denoting sufficient structure. *See, e.g.*, *Parity Networks*, 2020 WL 8569299 at *6 (holding "engine" is a classic nonce term and does not denote sufficient structure).

### H.    Machine learning [algorithm/engine/system]

Plaintiff repeats its unavailing arguments from the "heuristics engine" terms for the "machine learning" terms. In each instance, the "machine learning" term is combined with a nonce word (algorithm/engine/system) that is simply a substitute for "means for." *See, e.g.*, *Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*, No. 1-14-CV-134-LY, 2015 WL 4937464, at *5 (W.D. Tex. Aug. 18, 2015) ("The court finds that 'system,' as used in the claim, functions merely as a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'") (internal citation omitted). And each time these claim terms are recited, they are functionally claimed. *See, e.g.*, '691 patent at 20:8-9 ("wherein the determined remediation code is generated by executing a machine learning algorithm"); '280 patent at 36:8-9 (claiming "a machine learning engine configured to" perform various functions); '120 patent at 35:24-46 (listing the various functions performed by the machine learning system). The "machine learning" terms are thus subject to §112(f).

Plaintiff again cites to *Apple* and *Skyy*, arguing that because "machine learning" can be defined, it is not subject to § 112(f).  D.I. 36 at 32-33.  It even points to Defendant's own website as evidence that the term "machine learning" has some meaning.  *Id.* at 33.  But this is beside the point.  The word "software" has a known meaning and is often used by companies in promotional materials, yet claim terms reciting "software" for performing functions are subject to § 112(f).  *See, e.g.*, *Noah Sys.,* 675 F.3d at 1312; *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).  The relevant inquiry to determine if a term is subject to §112(f) is not whether the claim term can be defined, but **whether it denotes sufficient structure**.  *See Skyy*, 859 F.3d at 1020; *Advanced Ground*, 830 F.3d at 1347.

Here, the "machine learning [algorithm/engine/system]" terms do not denote any structure, and Plaintiff points to no such structure in its brief.  These terms refer to some sort of algorithm/software for performing the claimed functions and thus the specifications must disclose sufficient algorithms/steps to provide the necessary structure.  *See Noah Sys*, 675 F.3d at 1318-19.  At most, the "machine learning [algorithm/engine/system]" claim terms cover broad classes of software, which is insufficient to denote sufficient structure.  *Advanced Ground*, 830 F.3d at 1347-48 (holding "symbol generator" term did not disclose sufficient structure even if a POSA would understand it to refer to a broad class of software modules).

Plaintiff also points to the fact that the specifications repeat the claimed functions for the machine learning [algorithm/engine/system].  D.I. 36 at 32.  But merely repeating the functions of software or classes of algorithms cannot provide sufficient disclosures of structure.  *See, e.g.*, *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1382 (Fed. Cir. 2013) (merely restating the function of an algorithm cannot provide sufficient disclosure).  Further, Plaintiff concedes that the '691 patent provides no guidance on the scope or structure of the claimed

"machine learning algorithm," as the term does not even appear outside of the claims.  D.I. 36 at 32 (citing '691 patent claims).  In sum, the "machine learning" terms do not inherently denote sufficient structure, are subject to §112(f), and are indefinite because the specifications fail to disclose algorithms or steps to provide the claimed function.

Finally, Plaintiff's proposed construction of "software/engine/system that performs a task based on learning from input or samples" suffers from the same defects as its proposed construction for heuristics engine, as it is both confusing and irreparably broad.  Indeed, Plaintiff's proposed construction would *still* fall under §112(f) since it describes a "software/engine/system" (all nonce terms) that use an undisclosed software algorithm to perform a task.  *See, e.g.*, *Parity Networks*, 2020 WL 8569299 at *6 (nonce terms do not denote sufficient structure and an algorithm must be disclosed to avoid indefiniteness).

### I.  Contextual cues

As explained in accessiBe's opening brief, accessiBe's proposed construction is drawn straight from the specification and the claims, and reflects the plain and ordinary meaning of the term as it would have been understood by a POSA.  This proposed construction is not, as Plaintiff argues, limited to the examples identified by the claims and the specification, but rather encompasses other types of information from nearby elements other than the examples listed.  Plaintiff has identified no disclosure in the patent that supports a broader meaning of "contextual cues" to encompass things outside the web page, such as time of access, location of the user, or the like.  To the extent this phrase we to be given such a broad meaning, it would be invalid under Section 112 for failing the written description requirement.

### J.  Artificial intelligence algorithm

Plaintiff's arguments regarding "artificial intelligence algorithm" are contradicted by both the law and facts.  Plaintiff does not, and cannot, dispute that: (1) the claimed "artificial intelligence

algorithm" is a software program; (2) "artificial intelligence algorithm" does not denote a specific structure; and (3) that the specifications fail to recite any algorithms for the claimed "artificial intelligence algorithm[s]." When a claim recites a function performed by a software algorithm, as is the case here, the specification must recite the algorithm itself in order to avoid indefiniteness. *See EON Corp. IP Holdings LLC v. AT & T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015).

First, Plaintiff once again parrots the argument that this term cannot be a means-plus-function term subject to §112(f) where "artificial intelligence algorithm" is understandable to one of ordinary skill in the art. This argument is legally and factually incorrect. First, as explained above, whether a term is subject to §112(f) depends on whether the term denotes sufficient structure for performing the claimed functions, *not* whether the term can be defined or understood by a POSA. *See supra*, § III(G). Second, Defendant provided myriad examples of how "artificial intelligence algorithm" does *not* have a plain and ordinary meaning, that persons of skill in the art famously cannot agree on the scope or definition of artificial intelligence, that previous courts have found "artificial intelligence" to lack structure, and that the USPTO itself has recognized that there is no agreement over the meaning of artificial intelligence and that reciting such claim terms may result in §112 invalidity issues. *See* D.I. 33 at 33-38.

Instead of addressing Defendant's arguments and evidence, Plaintiff merely states that "artificial intelligence" is found in dictionaries and Defendant's marketing materials, and thus there is a common understanding of the term. D.I. 36 at 37. But all §112(f) terms using existing words can be always defined as the words can be found in dictionaries (e.g., "software engine" or "symbol generator"); that does not mean the terms denote sufficient *structure*. *See Advanced Ground*, 830 F.3d at 1347 (rejecting argument that claim term does not fall under §112(f) simply because the term and the words in the term are understood by a POSA).

And again, Plaintiff cites to *Apple* (which was overturned by *Williamson*) and *Skyy* (which found a "mobile device means" term itself denoted sufficient structure, regardless of any additional disclosures in the specification) to argue that the term "artificial intelligence algorithm" denotes sufficient structure. This is wrong, as the plain language of the term confirms that it is claiming an *algorithm* and Plaintiff does not explain what the structure would be. And it is undisputed that where a claim recites an algorithm for performing a function, the term is subject to §112(f) and the specification must describe "enough of an algorithm to provide the necessary structure under § 112, ¶ 6 . . . in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted).

Next, Plaintiff argues that *Gradient Enters., Inc. v. Skype Techs. S.A.*, is inapposite because "artificial intelligence algorithm" appeared in the specification rather than as a claim term. D.I. 36 at 39 (citing *Gradient*, No. 10-cv-6712L, 2015 WL 5567926 (W.D.N.Y. Sept. 22, 2015)). But the issue in *Gradient* was whether the disclosure of an "artificial intelligence algorithm" denoted sufficient structure to a POSA – the same issue here. *Gradient*, 2015 WL 5567926 at *6. The court correctly found that such a disclosure was deficient because the specification did not actually disclose the claimed algorithms. *Id.* Here, the "artificial intelligence algorithm" terms similarly lack sufficient structure on their own, and the specification fails to provide the underlying algorithms necessary to find these terms definite. As the court ruled in *Gradient*, "it is not enough to show that a person of skill in the art might be able to choose an appropriate algorithm and program it into a computer; the patent itself must still disclose such an algorithm." *Id.* at *7 (citing *Triton Tech of Texas LLC, v. Nintendo of Am., Inc.,* 753 F.3d 1375, 1379 (Fed. Cir. 2014)).

Finally, Plaintiff fails to meaningfully respond to Defendant's arguments that Plaintiff's

proposed construction ("software that performs a task by simulating human thinking") does not provide any clarity or bounds for this term, and that any basic software process would potentially fall under this vague and overbroad definition.  *See* D.I. 33 at 37-38.  Further, this definition also fails to recite sufficient structure for the claimed "software" and would still be subject to §112(f), again resulting in indefiniteness because the specification does not disclose an algorithm for performing the functions of the claimed software.

### K.      [The] computer system

Plaintiff alleges that this claim term is a "typographical error" and asks the Court to rewrite the claim in order to save it from indefiniteness.  *See* D.I. 36 at 40-41.  But reciting "the computer system" three times instead of "the remote server" was not a typographical error and, regardless, "[i]t is not [the Court's] function to rewrite [indefinite] claims to preserve their validity." *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349 (Fed. Cir. 2002).

There is no intrinsic or extrinsic evidence that the "computer system" terms, which appear three times in claim 10 of the '877 patent, were typos and that the applicant instead meant to write "the remote server."  Plaintiff argues that the context of claim 10 and the specification provide evidence that the functions performed by the recited "computer system" are actually performed by the "remote server."  D.I. 36 at 40-41.  This is wrong.  Plaintiff ignores the fact that the specification also recites that these same functions can be performed by the user computer or even a second server.  *See* D.I. 33 at 39-40 (citing '877 patent at 2:50-55, 4:58-62, 15:4-16). And Plaintiff's arguments that the recited "computer system" must be the "remote server" because it falls within a "wherein clause that describes the functionality of the remote server" (D.I. 36 at 40) ignores the fact that the "computer system" terms actually fall within a *second* wherein clause that describes the pre-existing remediation code, *separate from the steps of detecting and mapping* that are performed by the remote server.  '877 patent at 20:8-31.  A POSA would not know from

context whether the "computer system" is the "remote server," the claimed "user computer," or the second server recited in the specification so the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

### L.    Assessing a validity of a . . . descriptive attribute

Plaintiff's arguments that the preambles are not limiting are unavailing.  As explained in Defendant's opening brief, the preambles are limiting here because they: (1) provide the antecedent basis for later claim terms; (2) are essential to understand limitations or terms in the claim body and breathe life into the claims, and (3) the preambles recite steps underscored as important in the specification.  D.I. 33 at 40-41 (citing *Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6-19-CV-00167-ADA, 2020 WL 376664, at *7 (W.D. Tex. Jan. 23, 2020) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808–09 (Fed. Cir. 2002)).

Plaintiff does not dispute that the preamble provide the antecedent bases for various claim terms and does not address Defendant's case law holding this is an important factor in determining whether a preamble is limiting.  Instead, Plaintiff argues that the antecedent bases in the preambles are not essential to understanding the claim terms.  D.I. 36 at 43 (citing *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010)).  It is wrong and the case that Plaintiff cites in support is unavailing.  The court in *Am. Med. Sys.* found a preamble not limiting in view of numerous factors and confirms that "[w]hether to treat a preamble term as a claim limitation is 'determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'"  *Id*. at 1358 (internal citation omitted).  Further, the court found that the preamble in that case only included the antecedent basis for a single term, and that the preamble did not define or refine the scope of the claims.  *Id.* at 1359.  By contrast, here, the preambles include the antecedent basis for *three* claim terms and provide the scope of the claims.  *See* D.I. 33 at 41-42.

The preambles here are closer to those in *Digital Retail Apps*.  2020 WL 376664, at *8. In *Digital Retail Apps.*, this Court found a preamble limiting where it recited the antecedent bases for several terms in the claim body, the full scope of the claim made no sense without considering the preamble, and where terms in the preamble helped the claim limitations "come into focus."  *Id.* Similarly, here, the preambles recite the antecedent bases for several of the claim terms, provide understanding of the scope of the claims (assessing the validity of a previously assigned textual description), and help bring the claims into focus (seeing if the previous remediation needs to be updated).  D.I. 33 at 41-42.

Without the preambles reciting that the claims are intended to assess the validity of a previously assigned descriptive attribute, the scope and purpose of the claims is lost.  At most, claim 1 would merely recite periodically performing a remediation (without checking the previously assigned attribute for validity) and claim 10 would recite seeing if a web element has changed (rather than assessing the validity of a descriptive attribute).  Indeed, without the preamble, the "untagged element" of claim 10 could be read as an element lacking a tag, when in fact it refers to a *previously untagged* element that now requires evaluation to determine if the earlier tag is still appropriate.  *Id.*  The preambles thus breathe life into the claims by defining their subject matter and giving them meaning that would otherwise be lost.  *See, e.g.*, *Am. Imaging Servs., Inc. v. Intergraph Corp.*, 2000 WL 772725, at *5 (Fed. Cir. 2000).  Because the preambles give meaning and describe the purpose of the claims, which are not otherwise conveyed by the body of the claims, they are limiting.  *See Digital Retail*, 2020 WL 376664, at *7.

## IV.   CONCLUSION

For the aforementioned reasons, Defendant respectfully requests that the Court adopt Defendant's proposed claim constructions.

Dated: September 17, 2021

Respectfully submitted,

*/s/ Cabrach J. Connor*

By:  Cabrach J. Connor
Cabrach J. Connor
Texas Bar No. 24036390
cab@connorkudlaclee.com
Kevin S. Kudlac
Texas Bar No. 00790089
kevin@connorkudlaclee.com
**CONNOR KUDLAC LEE PLLC**
609 Castle Ridge Road, Suite 450
Austin, Texas 78746
512.777.1254 Telephone
888.387.1134 Facsimile

NEEL CHATTERJEE (*Pro Hac Vice*)
NChatterjee@goodwinlaw.com
LUC DAHLIN (*Pro Hac Vice*)
LDahlin@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA  94063
Phone:  (650) 752-3100
Fax:      (650) 853-1038

SAMUEL SHERRY (*Pro Hac Vice*)
SSherry@goodwinlaw.com
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA  02210
Phone:  (617) 570-1000
Fax:      (617) 523-1231

**ATTORNEYS FOR DEFENDANT
ACCESSIBE, LTD.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 17, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.